**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**April 19, 2016**

# In the Court of Appeals of Georgia

A16A0140. MALPHURS v. THE STATE. PE-004C

PETERSON, Judge.

Juaquin Malphurs' bag had a gun in it. There are many places in Georgia where a gun in a bag would not excite comment; unfortunately for Malphurs, the TSA screening area of Hartsfield-Jackson International Airport is not among them. Malphurs did not have a weapons carry license and was arrested and charged with several crimes. Notably for the purposes of this appeal, he was charged with violation of OCGA § 16-11-127 (which makes it a misdemeanor for a person without a weapons carry license to carry a weapon in a government building) and OCGA § 16-11-130.2 (which makes it a misdemeanor for a person without a weapons carry license to possess knowingly a weapon while entering an airport security screening checkpoint). Malphurs appeals the trial court's denial of his general demurrer,

arguing that the two statutes conflict as applied to his case and that he can be charged only under OCGA § 16-11-130.2 (with its more demanding knowledge requirement). We affirm the trial court because the two statutes do not conflict.

The material facts are not disputed for purposes of this appeal.[1] On October 10, 2014, Malphurs placed his luggage on an x-ray scanner at the TSA security checkpoint at Hartsfield-Jackson International Airport. As the bag proceeded through the scanner, TSA agents observed an apparent handgun inside the bag. A police officer confirmed the handgun's presence in Malphurs' luggage. Malphurs did not hold a weapons carry license and was subsequently arrested and charged with five counts. Counts 1 and 2 charged him with carrying a weapon in an unauthorized location in violation of OCGA § 16-11-127(b), Count 3 charged him with reckless conduct, Count 4 charged him with carrying a concealed weapon in violation of OCGA § 16-11-126, and Count 5 charged him with carrying a weapon at a

---

[1] The State devotes the first two substantive pages of its brief to an argument that we should disregard Malphurs' brief because its page margins do not comply with Rule 24(c) of our court and his record citations are improperly formatted. The State is factually correct in its criticism, but fails to notice that its brief, too, fails to comply with our rules. The font of the State's footnotes is far smaller than the 10 characters per inch required by our Rule 1(c). Counsel for both parties are reminded of their obligation to comply with our rules, and we will exercise our discretion to address the arguments presented. *See Jones v. State*, 241 Ga. App. 768, 769 (1) (527 SE2d 611) (2000). *See also* Matthew 7:1-5.

commercial airport in violation of OCGA § 16-11-130.2. He demurred to both counts of carrying weapons in unauthorized locations, which the trial court granted with respect to Count 1[2] but denied for Count 2.[3] Malphurs filed a motion for reconsideration, which the trial court denied, prompting this interlocutory appeal.

Malphurs argues as his sole enumeration of error that the trial court erred by denying his demurrer as to Count 2 because it is based on a violation of OCGA § 16-11-127, which he argues conflicts with the statute on which Count 5 was based, OCGA § 16-11-130.2. He argues that OCGA 16-11-130.2 must control because it is the more specific statute governing the conduct at issue and because the legislature intended it to supercede OCGA § 16-11-127 as applied to airports. We disagree.

We review a trial court's ruling on a general demurrer de novo "in order to determine whether the allegations in the indictment are legally sufficient." *Sallee v. State*, 329 Ga. App. 612, 616 (2) (765 SE2d 758) (2014) (citations omitted).

---

[2] Count 1 charged Malphurs with carrying a weapon without a license in an unauthorized location, that is, "in the Transportation Security Administration (TSA) passenger screening checkpoint, a restricted access and unauthorized location for firearms, while in a government building."

[3] Count 2 charged Malphurs with carrying a weapon without a license in an unauthorized location, that is, "into a government building, Hartsfield-Jackson Atlanta International Airport[,]" and further noted that the "count is separate and distinct from any other counts" of the accusation.

OCGA § 16-11-127 (b) prohibits people who lack weapons carry licenses from carrying a weapon in a government building. *See* OCGA § 16-11-127(b). A "government building" is defined as a "building in which a government entity is housed[.]" OCGA § 16-11-127(a)(2)(A). Malphurs concedes that the airport qualifies as a "government building" within the meaning of OCGA § 16-11-127. Violation of this subsection by a person who lacks a weapons carry license constitutes a misdemeanor. *See* OCGA § 16-11-127(b).

OCGA § 16-11-130.2 prohibits an individual from entering a restricted access area of a commercial service airport in or beyond the airport screening checkpoint while knowingly possessing or having under his or her control a weapon or long gun, and specifically excludes from the prohibited area the "airport drive, general parking area, walkway, or shops and areas of the terminal that are outside the screening checkpoint and that are normally open to unscreened passengers or visitors to the airport." OCGA § 16-11-130.2(a). Violation of this subsection by a person who lacks a weapons carry license constitutes a misdemeanor, absent intent to commit a separate felony. *See* OCGA § 16-11-130.2(b).

Malphurs argues these provisions conflict as applied to his case because although OCGA § 16-11-130.2 and § 16-11-127 both prohibit weapons in Hartsfield-

4

Jackson, only OCGA § 16-11-130.2 requires the possession to be "knowing." But Malphurs is mistaken. "When the courts are called upon to determine if there is a conflict between statutes they are required to undertake to construe them together and seek to give full effect to both laws as representing all of the legislative intention." *Fulton Cnty. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints*, 133 Ga. App. 847, 851 (1) (C) (212 SE2d 451) (1975). Both statutes apply here without conflict.

As a nonlicense holder, Malphurs was prohibited under OCGA § 16-11-127 (b) (1) from carrying a weapon into a government building — that is, the airport. *See* OCGA § 16-11-127(b)(1). He could be validly charged with a misdemeanor for violating this prohibition, and indeed, was charged with such a violation in Count 2 of his indictment, which he now challenges on appeal. That Malphurs allegedly committed a separate offense by entering the airport security screening checkpoint while knowingly possessing or having in his control a weapon does not invalidate the first charged offense. In this context, OCGA § 16-11-127 criminalizes the carrying of a weapon by a nonlicense holder through the airport's doorway. If Malphurs had stopped there, he would have violated only OCGA § 16-11-127. OCGA § 16-11-

130.2 then criminalizes carrying the weapon further — to the security screening checkpoint. There is no conflict between the statutes.

Malphurs argues, however, that interpreting the statutes in this manner ignores the General Assembly's intent in passing OCGA § 16-11-130.2. He asserts that the General Assembly intended to relax gun laws as they relate to carrying firearms in airports, and concludes that we would undermine that intent by applying OCGA § 16-11-127 to the non-secure portions of airports carved out of OCGA § 16-11-130.2's prohibition. We disagree.

It is fair to presume that the General Assembly intended to provide some protection against prosecution when firearms are brought to an airport's security checkpoint; indeed, that is precisely what the text of OCGA § 16-11-130.2 does. But the text of that protection limits its scope to preventing prosecution for the crime created by OCGA § 16-11-130.2.

The focus of OCGA § 16-11-130.2's protection is on weapons carry license holders. License holders — and only license holders — have the opportunity to leave the security area without criminal penalty after being notified they have a firearm; people like Malphurs who lack a license have no similar opportunity. *See* OCGA § 16-11-130.2(b). The same statutory distinction is also present in OCGA § 16-11-127.

6

There, license holders — and only license holders — may carry firearms in non-secure portions of government buildings and have the opportunity to leave a security screening area without criminal penalty after being notified that they have a weapon. OCGA § 16-11-127(e)(1). People who lack a license may not carry weapons in government buildings at all. OCGA § 16-11-127(b)(1).

If Malphurs was a license holder, he could have carried his firearm in the nonsecure portion of the airport under both OCGA § 16-11-130.2 (because OCGA § 16-11-130.2 carves that portion out from its prohibition for all people) and OCGA § 16-11-127 (because license holders can carry firearms in non-secure portions of government buildings). He also could have left the security screening area without criminal penalty once his gun was discovered under both OCGA § 16-11-130.2 (because the statute allows license holders to do so) and OCGA § 16-11-127 (because the statute allows license holders to do so).

But because Malphurs was not a license holder, he is not entitled to the protections the General Assembly applied only to license holders. Not being a license holder, Malphurs could have carried his firearm in the non-secure portion of the airport under OCGA § 16-11-130.2 (because OCGA § 16-11-130.2 carves those portions out from its prohibition for all people), but not under OCGA § 16-11-127

7

(because people who lack weapons carry licenses cannot carry firearms in any portion of government buildings). And not being a license holder, neither OCGA § 16-11-130.2 nor OCGA § 16-11-127 allowed him to leave the security screening area without criminal penalty.

Instead, Malphurs is left merely to argue that the General Assembly intended to protect carriers of firearms generally, and thus we should read the statutory scheme to protect him. But that is not how legislative intent or laws work. The General Assembly does not enact a general intention, it enacts statutes. Statutes have words, and words have meanings. It is those meanings that we interpret and apply, not some amorphous general intention.

Our conclusion is buttressed by the implications Malphurs' argument would have for other firearm statutes. Malphurs was also charged with violating OCGA § 16-11-126, which prohibits persons without a weapons carry license from carrying a weapon anywhere outside of their property, their motor vehicle, or their place of business. If OCGA § 16-11-130.2's carve-out of non-secure portions of airports affords not merely protection against prosecution under OCGA § 16-11-130.2, but also creates an affirmative right for anyone to carry a weapon in those portions of airports, the necessary implication is that OCGA § 16-11-126 now has a fourth place

8

in which persons who lack weapons carry licenses can carry weapons: their home, their car, their place of business, and non-secure portions of airports. The language of OCGA § 16-11-130.2's carve-out is not rights-creating language (such as "persons may carry weapons"), it is a double negative (no person shall carry weapons in a restricted access area, but such area shall not include non-secure locations). We decline Malphurs' invitation to invent new rights not created by the General Assembly.

We arrive at this conclusion without considering one authority to which the parties seek to draw our attention. Both parties rely on what they call legislative history of the two statutes at issue to support their respective arguments. They point us to an article about the legislation in the Georgia State University Law Review, which in turn quotes an op-ed in the Atlanta Journal-Constitution written by State Representative Rick Jasperse — the author of a different bill that did not pass, some provisions of which were incorporated into a bill that did — regarding his belief of the legislation's intent. *See* Tyler Becker et al., *Crimes And Offenses: Offenses Against Public Order and Safety*, 31 GA. ST. U. L. REV. 47, 50 n.11 (Fall 2014). The

9

trial court likewise relied on this article in its order. But this is not the kind of legislative history on which it is appropriate to rely.[4]

As we have previously observed, our concern is with the actual text of statutes, not the subjective statements of individual legislators expressing their personal intent in voting for or against a bill. *See Walters v. State*, 335 Ga. App. 12, 15 n.3 (2015); *Rutter v. Rutter*, 316 Ga. App. at 896 n.5 (1). *See also Merritt v. State*, 286 Ga. 650, 653-57 (690 SE2d 835) (2010) (Nahmias, J., concurring specially); *Day v. Floyd County Bd. of Educ.*, 333 Ga. App. 144, 150-51 (775 SE2d 622) (2015) (Dillard, J., concurring fully and specially); *Keaton v. State*, 311 Ga. App. 14, 31 n.17 (714 SE2d 693) (2011) (Blackwell, J., concurring in part and dissenting in part). And the very "legislative history" on which the parties seek to rely explains why this is so.

The law review article on which all the parties rely quotes Rep. Jasperse's views on the intent of the legislature, but it also discusses at length conflicting views of the House Minority Leader, Rep. Stacey Abrams. 31 GA. ST. U. L. REV. 47 at 51, 68, 69. Although Rep. Jasperse voted in the majority and Rep. Abrams voted in the

---

[4] That kind is "a more objective sort of legislative history, the legislative votes upon, and amendments of, the bills that ultimately were passed and approved as the statutes in question." *Rutter v. Rutter*, 316 Ga. App. 894, 896 n.5 (1) (730 SE2d 626) (2012) (overruled on other grounds).

minority, that does not constitute a reason to consider one view as more legally significant than another; the one-person, one-vote principle applies to the red and green buttons on the desks of the General Assembly as much as it does at the ballot box. Rep. Jasperse's vote on the legislation counted as one vote only, precisely the same weight afforded to Rep. Abrams' vote; similarly, his subjective statements about why he cast that vote are no more relevant to our determination of the meaning of the statutory text than are Rep. Abrams'. Accordingly, we do not consider either, and limit our consideration only to the text and context of the statute.

For the reasons outlined above, the trial court did not err in denying Malphurs' general demurrer.

*Judgment affirmed. Phipps, P. J., and Dillard, J., concur*.